First case on the call is 5-14-0046, Board of Trustees of SIU v. Jones. Counselor? Yes, I am, Your Honor. Good morning. My name is Daryl Hunnam. I am representing the Realtors, Becker and Weiss. And this is a Illinois Public Claims Act claim, where SIU is named as a party plaintiff. But it's pretty obvious to the Court that the State of Illinois has declined to vigorously prosecute the action. One of the issues that was raised in the briefs was whether SIU was involved at all. But you can see very early on in these false claims actions, Becker and Weiss was directed to notify the Attorney General. The Attorney General's office has been served on all the proceedings, etc., etc. So the contention that the State of Illinois has invested itself in any interest in the case, I think is just not true. And this is kind of important with regard to the issue of disqualification of counsel. Because there is a dispute between the parties as to, number one, whether SIU's legal counsel could enter her appearance at a deposition and assist in the defense of Mr. Jones, who is a SIU employee. We take two positions with regard to that. Number one, the waiver of conflict of interest, I think that would be an effective waiver by the defendant, Mr. Jones. But we do not believe that the chancellor of the university had the authority to waive SIU's conflict. That's issue number one with regard to the disqualification. Issue number two is the fact that I don't think it could be waived in any manner under the rules of professional conduct. Because if Becker and Jones are successful in the suit, some of the money that they will eventually recover will go to the State of Illinois, presumably SIU. If they are not successful and the court upholds the motion for summary judgment, then their other client, Dan Jones, Miss Daly's other client, Dan Jones, will not be required to pay anything. You're in a situation where you are advocating for two people, I would argue, and certainly SIU is the main party in the suit. A more important issue of summary judgment. The basis of this case is my clients are SIU employees. They came to realize that one of the, what would be kind of a contract employee for their department, was billing the university and being reimbursed for travel time from what we contend would be his home to SIU on numerous occasions. And the total billings have exceeded $13,000. And I don't think there's any dispute between the parties. If in fact his home is not his headquarters, his home is not his office, then the vouchers should not have been submitted and they should not have been paid. If in fact the court affirms what the trial judge did, and this is his office, then summary judgment was properly granted. And I think that's the crux of the issue here. Was he instructed by SIU to bill from his home on his travel and his involvement there? There's an affidavit in there where in a conclusionary way Mr. Jones indicates that he got authority from or approval from his superiors at SIU to do this. But of course the problem with the affidavit is that it's completely hearsay. The people are not identified. We don't know who they are. We don't know when the conversations occurred. We know nothing about them at all. Now, the SIU, I shouldn't say SIU, but it really is SIU that's defending this case. Let's just be honest about it. I noticed Mr. Cooper when he signed in here in the signing sheet down below said SIU case. And Ms. Daly is here in the courtroom. So this is SIU that's defending this case. And they argue that, well, the objection was not raised before the trial judge. Well, arguably that's true, but I cited several cases that indicate a motion for summary of judgment. We have to weigh the evidence and weigh its probative value. And that affidavit has no probative value at all because it's so lacking in specifics that we know nothing about the details whatsoever. But on the other side of the situation is there is a compelling list of facts, many of which the trial judge did not place into his order, that point to the fact that the headquarters, the office, if you will, was at SIU. Number one, if you look at C391 of the record going all the way up to C405, he was a contract employee. So every year he had to renew his appointment, every year. And it starts in 2007 and goes all the way up to 2010. Where does it indicate that he's going to be doing his work from? It doesn't mention his residence in Belleville. It mentions Guam. That's a building at SIU and a specific office number at SIU. Mr. Dunham, in this act, the False Claims Act, isn't it true that in order to find liability you have to have a knowing violation? That is true. And didn't the court find that there was no knowledge on the part of Mr. Weber, Mr. Jones, who was billing the university? And that would be a credibility determination and would go into his assignment or go into his intent, which I think on summary judgment traditionally trial courts and appellate courts are low to decide issues of intent on motions for summary judgment. That should be judge credibility. But in this case you have the university year after year making the same payment, right? They're reimbursing him. Yes, that is true. Is it your position the university doesn't know what's going on in its own business? Well, and that's a very important point, Your Honor, because I think it is probably true that there may have been some people that were, although there really isn't any evidence to support that, but arguably somebody at the university was aware of the fact that Jones' situation was. But somebody from the university would have signed the contract, right? Say again, Your Honor? Somebody from the university would have signed the contract? That's correct. And the office was published in some kind of handbook? Correct. And so a payment was made to this individual? Correct. And yet it's your contention on behalf of Mr. Jones that the university didn't know what it was doing, couldn't read its own handbook, didn't know that it was issuing a check? Your Honor, I don't really know for sure because there isn't any affidavits to that effect in the record. What is your evidence of knowledge? Thank you, Your Honor. Number one, every six months he signed a notice of appointment form indicating that his office was at SIU. It doesn't mention his Springfield home at all. In his own deposition testimony, he admitted, number one, he doesn't spend any time at that office. He doesn't interview students at his home. It's a separate room in his house. It's not secure. He does keep a filing cabinet, which is not secure. There's no wheelchair access. He doesn't meet any students. He doesn't meet any faculty. Nothing happens at that office. And he does all that stuff at Carbondale, is that what you're saying? No. He does nothing at Carbondale, actually, at his building office. He doesn't do anything. He goes to different schools, doesn't he, and view teachers and things like that? That's exactly what he does, Your Honor. So that's where I'm having trouble. Well, there is a form that we mentioned in our brief, the TA-212 form, because they've had problems, and obviously in the state of Illinois, it's administrative regulation. They've had problems with these kinds of issues before. And so there's a legislating audit committee, and it basically says, if you're going to try and designate a headquarters at someplace other than where you spend the majority of your time, then you have to fill out this form, you have to send it out to Springfield, and let them review the facts and circumstances to determine whether this is an appropriate designation. Jones didn't do that. Well, the university did it all for him when they called the ROM built room, the room at the ROM building. Correct, Your Honor. That's what's so frustrating to us. Other than the travel expense voucher that he's been sitting in, there's no independent written evidence that his home is his headquarters, that his home is his office. There's nothing. Everything. Basically what he is doing is he is in the field supervising student teachers and the teachers in charge of those student teachers. ROM is the education building, and he has half a cubbyhole in ROM. Isn't that basically the reality of how he spends his time? Your Honor, it's more than half of a cubbyhole. I think anything fair about it is it's an office that he shares with somebody else. His name is on the door. The phone number that's listed in the catalog or was listed at that time in the catalog is not his phone number in Belleville. It's the ROM phone number. In fact, if you really want it, what I think is really the problem here is there's very little justification that Mr. Jones could have made and did make in his deposition as to why he's having all these trips departmented and having the university pay for it. That's the real crux of the matter. At the mileage rates that they're being paid, we've got $13,000 worth of trips going back and forth, back and forth, back and forth, back and forth for no reason. In the position he's in, he would be dealing with the SIU students as student teachers in the classroom setting as opposed to Carbondale. Exactly, Your Honor, and that's the point. We have no right about the fact that Mr. Jones, and we tried to do some calculations in the deposition as to whether he was getting mileage expenses from Carbondale as opposed to Belleville, and the best we can figure out, it's a wash. We're not challenging any mileage expenses that Mr. Jones may have made between Belleville and Mount Vernon or other outlying areas. That's not the gravamen of our case. But the problem is that we think the record demonstrates a tribal issue of fact that what he's doing is he's going back and forth, back and forth, back and forth for no reason, and he's billing the university. Now, if he wasn't getting reimbursed, it's our belief that he wouldn't be making nearly as many trips. But it's a way of padding his income, and that's why we're bringing the suit. And as I say, there's a plethora of evidence here that says on all of the external documents except for his travel reimbursement vouchers that his headquarters, his office, is in Carbondale. And he signed those forms every year, and getting to the point knowingly, our point is he's signing these forms every year, Your Honor, and it says on Room 327, he's signing those forms. But your claim, and you just said it, is that we believe he would not be making as many trips if he weren't being reimbursed. My question is, what proof do you have of that? Because all of the documentary evidence indicates that his office is in Carbondale. So just because his office is in Carbondale, you think he'd make less trips, not zero trips, but less. How many less? That's why we have a trial, Your Honor. Well, but what is your evidence going to be? That's why summary judgment was granted. Well, if you look at the deposition testimony, Your Honor, the questions are asked, well, why are you coming back? And he says, well, sometimes faculty meetings, sometimes I need to meet with people, and I ask for specifics, and he had none. Well, how about the faculty meetings? Do you consider that a just reason? He's not a voting member of the faculty, Your Honor. But if he's required to be there, whether he's a voting member or not, would you consider that a just reason? There's nothing in the evidence that indicates he was required to be there. In fact, if he was required to be there, then maybe there's an argument as to whether he should have gotten additional stipend or not. He still wouldn't, even if he was required to be there, because we have SIU employees that by designation, they make the big issue of the fact that there's employees up in Chicago and other places, and they file a separate reimbursement expense. But there's no showing that he was required to be at any of these meetings. There's no reason, there's no showing as to why he couldn't have handled any of these issues over the phone or by email or the like. And $13,000, Your Honor, why? And the record begs no answer. I would like to raise a couple of other issues, if I could, because I think they're very important to the Realtors and to me personally. Number one, the trial judge awarded costs. There's no showing that Mr. Jones had paid anything in the way of costs. And I think, you know, the elephant in the room tells us, SIU is paying the costs. And I think it's grossly unfair for Becker and Weiss to have to pay these costs. Number two, more importantly, I cite a couple of cases in my brief indicating that deposition costs are not to be taxed unless they're used at trial. And there was no effort on the part of SIU to rebut those cases. They just ignore them altogether. And so remind me, I don't remember if it's in the briefs or not, what positions are Becker and Weiss in in the department? They are tenured members of the faculty, Your Honor. In the education department? That is correct, Your Honor. And hence, they really feel like the department is being ripped off, and that's the way they came to me. I do want to spend a little bit of time on the deposition issue. Frankly, I don't think it's really been clarified in Illinois courts. The federal rule is, and I think it's been amply demonstrated, that if an opponent, either through his counsel or otherwise, wants to get a break in the deposition, obviously, you know, this is supposed to be a torture chamber, we allow breaks. But the federal rule, Rule 30, as interpreted by the courts, indicates that it's just like your testimony on the witness stand, and you're not supposed to go back in the room and start counseling your client as to how he's doing, whether he can get this question or not, or this is what you should answer, this is obviously the way that Mr. Dunham is going, you should anticipate this, etc., etc. You're not supposed to have those kinds of conversations. Interestingly, in the state of Illinois, there doesn't seem to be any case that speaks to that issue one way or the other. Was this a discovery deposition? Yes, it was. But of course, it was a Mr. Jones, anything he says is going to be an admission, and it's very important. So what we have here is a break was asked for. There wasn't any question pending, that's fair. And Mr. Cooper and Mr. Jones and Ms. Daly, they leave the room, and there's obviously something going on, and then they come back, and almost immediately thereafter, Mr. Jones has to clarify one of his answers. So I said, you know, obviously I've just been through this, because one of the cases that's cited in my brief is Hunt v. DeVita. I was involved in that case up in the Seventh Circuit, so I was aware of the case. And I basically said, okay, I think you've waived the privilege. What is it we need to discuss? Well, objection, privilege, instruct myself. Does that case say you waived the privilege if you talk to them? Yes, Your Honor, that's the federal rule. But that's not a federal case, is it? No, it's not. That's why I'm bringing the issue, because I think we need clarification in the state of Illinois, certainly in the Fifth District, as to what is appropriate deposition conduct. Now, I think the federal rule has a lot of merit to it, because I'm entitled to know what Mr. Jones thinks, what his testimony is. I don't want Mr. Cooper's version or gloss as instructed by Mr. Jones. Now, when I was a very, very young lawyer, I'd been watching too much TV, and the first deposition I ever did was with my client, and there was a question pending, and I whispered in my client's ear, and the more seasoned attorney, I'm surprised he showed that much restraint, put me in my place quickly. Now, what's the difference? Whispering in Mr. Jones' ear during the deposition, it would actually be more efficient, so he wouldn't have to take a break and go out in the hall and then talk to him, just whisper in his ear and tell him what's going on and what he needs to be doing. And I think no one would tolerate that kind of behavior in the middle of a deposition. Well, why is it acceptable to take a break, go out into the hall, you don't have to whisper into his ear, you just tell him because I'm not there and, you know, no more point of voice, what the problems are, what the landmines are, this is what you need to be worried about, and then you come back in and you clarify your testimony. So I think the federal rule is a very good rule. There isn't any Illinois cases on it, but I'm urging that you adopt the federal standards here. Well, isn't that the province of the Supreme Court and not the appellate court? There isn't any case, Your Honor, one way or the other. That's the problem. There's no case out there that says that what Mr. Cooper did was appropriate. Your Honor, that's not what I asked. And let me clarify my question. The rulemaking power for the Illinois courts resides in the Supreme Court, not in the appellate court. Isn't that correct? That is correct, Your Honor. Well, then what are we supposed to do as far as a federal rule or as far as adopting it? We're not in a position to adopt it even if we agree with you, are we? I'm not asking you to adopt the federal rule. I am asking you to adopt the case law interpretation. For instance, if that is where your mind is right now, then there's nothing to prevent Mr. Cooper from whispering in to Mr. Jones' ear. Now, surely the scope of the deposition rule should prohibit that kind of practice. I don't think we need to have the Illinois Supreme Court promulgate an amendment to our rules on deposition to prohibit that. The guidelines for discovery are in the Illinois rules. The circuit court has the duty and the right to oversee that. If the circuit court were to feel that given that this happened, assuming that this happened in the way you describe it, the circuit court in its discretion decides this is not a rule violation of the Illinois rules. That's a discretionary call for which we give the circuit court a lot of leeway, isn't it? I do not think it should be renewed on abuse of discretion for this reason, Your Honor, because we would get – if we're in one court in Jackson County and the judge is much more restringent on that, and nobody's going to know exactly what the policy is because I'm in courts all over southern Illinois. And one judge says, oh, this is fine, you can whisper into his ear. Another judge says, you know, we need to have a published opinion. Thank you, counsel. Thank you. May it please the court, good morning. My name is Ian Cooper. I represent Dr. Dan Jones. I'd like to start by going back to several of the questions that were raised by members of the court to Mr. Dunham during this portion of the argument. And I think what we've seen is a subtle but important shift in the claim that is being asserted in this case, and it's being raised for the first time before this court as far as I can tell. And that is that somehow Dr. Jones trips from his headquarters and office in Belleville, Illinois, to Carbondale. Those trips were unnecessary for some reason, that they were unneeded, that he really didn't need to go to Carbondale, as, Your Honor, you pointed out so appropriately, to attend a faculty meeting or to attend another bit of business that he was required to do. There is not a scintilla of evidence before this court, nor was there before the court below, that any of the meetings in Carbondale that Dr. Jones attended were unnecessary. I was under the impression it was the mileage from Belleville to wherever and back, as opposed to from Carbondale to wherever and back. Correct. Your Honor, that's absolutely right. Since 1978, when Dr. Jones was hired as a faculty member at SIU, a condition of his employment was that he work and remain in Belleville. And I think one of you appropriately pointed out that his job, if we could talk practically in reality what it was, was he was going to various external sites to oversee young teachers, new teachers, people learning to become teachers at their various externships, whether it was at Belleville High School or maybe it was in Texaco or maybe it was in wherever across the state of Illinois. And he would travel from his office, his home office, his headquarters, to oversee that work. And he would not charge and seek reimbursement for work that was done in Belleville. But if it was outside of Belleville, that travel necessitated relating to overseeing students' work, then he would seek reimbursement and was suggested he should seek reimbursement, and did with the full knowledge and consent of the university since 1978. But the point that I was trying to make was that for the first time we're hearing that the real beef in this case is that the meetings that Dr. Jones went to in Carbondale were somehow unnecessary. There's no evidence of that. There's zero evidence of that. In fact, the various reimbursement documents that were appended to the complaint file of this case discussed where he was going, when, and why. And many of them refer to those very things. It was a meeting with C&I instructors or it was a faculty meeting and so forth. The fundamental issue, of course, on summary judgment is, is there any evidence before this court? Is there a shred of evidence? Is there a tribal issue of fact on the issue of whether or not Carbondale was truly his headquarters? Was there any evidence that Mr. Dunn could point to that established that for purposes of the statutes and regulations that are before this court, that most of his work, most of Dr. Jones' work was conducted in Carbondale, Illinois? The trial court, in a carefully reasoned and thoughtful six-page opinion, held that there is not any evidence that Carbondale was the site of the majority of Dr. Jones' work. To this day, there is no such evidence. The only thing that we have heard from Mr. Dunn and his clients throughout the litigation in this case is that, one, on his appointment documents, it refers to an office, a shared cubbyhole, I think one of you referred to, in the Wendt Building. Well, that document we know, and of course the court rejected that argument, noting that that isn't a document that references headquarters. That's not a document that is created for the purposes of determining where headquarters is located for purposes of mileage reimbursement. That document is merely an appointment document that says, oh, by the way, you get WAM 327 to share with someone else if you're on campus for that. Let me digress just as a footnote, say, also. I think it's important for the court to put this in context and perspective. Dr. Jones was not the only person who had this important arrangement. There were other people, so I'm just muting the record, and the trial court cited this, that there were other members of the faculty who had the same kind of experience, where their headquarters was located where they lived, and they did this kind of external training and required them from time to time to go to Carbondale for meetings, and they were reimbursed. This is a longstanding approved practice by the university. There is nothing the least bit fraudulent about it. There's nothing that was concealed. There's nothing inaccurate. And might I add that at no time in this litigation have the plaintiffs ever claimed that any of the forms that were submitted by Dr. Jones were inaccurate in any way with regard to trips that he actually took. Now, that might be a fraudulent claim. If he said he went to Carbondale on such and such a date and it didn't happen, or if he said he went to Dupo or Texaco and it didn't happen. But that didn't happen. There's no evidence of that. In fact, I believe it was Wise who said in his deposition, no, we have no evidence that Dr. Jones didn't travel down the road when he said he traveled down the road, didn't go to places he said he did. So this is not a false claim situation where someone is being improperly reimbursed for something that they weren't entitled to or didn't do. To the contrary, this was openly, transparently known by everybody and approved since 1978. One of the documents that while referenced and cited by the trial court, but not discussed directly, but just anecdotally a piece of information in the record before this court. This is Exhibit C to this motion for summary judgment and appears in the record at C00356. This is the letter from December of 1983 by the chair of the Department of Curriculum Instruction, that is the department in which Dr. Jones worked, to the United States government, the Internal Revenue Service. And in that document in 1983, the chair of the department says that the establishment and use of an office in Dr. Jones' home is for the convenience and absolutely required by the university. The employee has no choice in this position, this letter says. It is used for university business associated with the duties of teaching, research, and service. It goes on to say that his home office has a telephone and will form a crucial function in the operation of the university and that this home office is going to be a necessity as long as Dr. Jones holds this position. This was stated in 1983, long before the charges were incurred that are being challenged here by the department chair to the United States government, to the Internal Revenue Service. This is not a hearsay statement, this is by Dr. Jones, this is evidence in the record upon which the trial court appropriately relied that says the university was aware that he had a home office. I think you asked the question about that, well where do you have evidence that the university wasn't aware of that? Well here's evidence that not only were they aware of it, they required it, they supported it, they told the U.S. government that it was required and helped him in the issue with regard to taxation issues before the Internal Revenue Service. He wanted a deduction, I assume. I'm sorry? Was he seeking a deduction? I don't actually know the answer to that question, but I bet you're right. It makes sense. So in sum, on the summary judgment issues before the court, I think we need look no further than the circuit court's careful opinion in which it goes through the record. And I take issue with what Mr. Dunham has said about the court didn't cite or refer to the evidence that Mr. Dunham relied on. I think the court did carefully review the evidence that Mr. Dunham claimed was relevant to the issues. But some of the things that Mr. Dunham was referring to before this court and before the court below, simply it's not material, it's not evidence of where the headquarters was located. Let me briefly address a couple of the other points that were raised by Mr. Dunham. The disqualification of counsel issue, the evidence issue with regard to the deposition piece and how that occurred, the cost issue, as the court has already stated and suggested by its questions, these are matters that are appropriately put to the circuit court to rule upon in its discretion. Let's take, for instance, the issue of disqualification of counsel and if that's a matter that the circuit court looked at carefully and thought about and issued actually an order rejecting the request for disqualification or anything of the sort. And I would add, importantly, that this disqualification issue has absolutely no bearing on the outcome of this case. There's no suggestion, for instance, that the fact that Ms. Daly was involved in litigation in the court below, that that somehow impacted the summary judgment ruling. There's absolutely no evidence of prejudice of any sort. With regard to the deposition, I was the counsel involved in that along with Mr. Dunham. I attended that deposition and I absolutely and categorically reject that there was anything inappropriate or unethical that happened or any violation of the rules in any way during that deposition. Mr. Dunham, in fact, has himself told you that what occurred during that deposition was that there was a question, there was a break, not right after the question, there was a break after, a series of questions between the question and the break. And later on, when the session resumed, there was a recollection given by the witness to clarify this testimony. He said, now I remember kind of the thing, which happens all the time in depositions and there's nothing inappropriate about it. The cases that he relied upon, Mr. Dunham relies upon, involve egregious sorts of things like literally objection after objection, interrupting the witness in the middle of an answer and suggesting an answer. The so-called whispering in the ear of, like that happened here. That didn't happen here. Of course not. There's nothing of the sort that happened here. Of course we can't, we as lawyers, this court can't change the written and published rules of the Supreme Court of Illinois. There's no authority to do that. But the bottom line is that nothing inappropriate whatsoever happened in that deposition. I think witnesses have to be able to correct their testimony if they recall something. That's what we want to happen. But you agree that if you were in court and a break was taken, the judge would instruct you not to speak to your witness? I think a judge has the power to do that, depending on circumstances. But I've been in plenty of trials and situations where that doesn't happen. It is a problem, though, in evidence depositions where lawyers try to get their clients to straighten out their testimony. We don't have any law on that in Illinois because of the discovery deposition. But it is a concern and a problem for practitioners. Well, Your Honor, I think that's a fair point. And that's exactly why trial courts have broad discretion to control discovery and make sure that it not only complies with the letter of the rules and law but with the spirit of it. And if there were a suggestion in a case that, in fact, witness tampering was happening or inappropriate coaching was happening, and we've all seen depositions where the speaking objection is given over and over and over, the witness already testified to blah, blah, blah, fill in the blank, those kinds of things, if they're egregious and they're repeated and they impact the nature of the testimony and the quality of the testimony, of course it's perfectly appropriate for a trial court to monitor that and correct it. And I do think the rules provide the discretion and power for a trial court to do that. But that situation is a complication. Do you think that the privilege is waived if that happens? I think that it would be the extremely rare and egregious case where that would happen. Obviously, we know that the attorney-client privilege is a sacred thing in this state and virtually every other state that I work in. And it is protected vigorously and jealously by the courts, and appropriately so. So what you're talking about, I think, to overcome that privilege, Your Honor, would be something where you have repeated instances of egregious kind of coaching and so forth and so on. And then on top of that, you've got a break and the testimony changed in a material way. It went from a red light to a green light. Then I think under those circumstances, with a full record showing that there was really egregious behavior, that might warrant something like that and this Court might approve it. But I think that it would really take something pretty significant and pretty egregious for that to be appropriate. Was there any claim that the corrected testimony in any way affected the outcome of this case? None whatsoever. I apologize. I confess. So how would this be relevant if the Court affirms the summary judgment? Well, if the Court affirms the summary judgment, these discretionary calls, from our point of view, are taken care of. They go away. But to your point, maybe there would be a little more consternation for everybody concerned if this were testimony on a truly material point, a pivotal hinge point in this case. I confess, I'm embarrassed to say I don't even remember what the alleged testimony was that was modified or changed. It's that irrelevant. And I don't think that Mr. Dunham has said in his brief how it was in any way material to the outcome of this case. Costs. Costs are permitted to the prevailing party and required by statute. There's not a shred of evidence in this case other than Mr. Dunham's supposition, suggestion, and otherwise that costs were somehow paid by someone else and they shouldn't be taxed appropriately here. I don't think that issue was before the Court below. It is appropriately before this Court. Dr. Jones endured this litigation for however long it's been since this case was on file. Attended depositions, did whatever he was required to do to litigate this case. I defended him in this case, and he's entitled to costs. What about the deposition costs? Do you think those are taxable before trial? I think deposition costs are taxable. I thought we cited cases which referred to that, but maybe I'm misremembering that, Your Honor. It certainly wasn't, there wasn't an issue for the trial court in this case with regard to the specific. It says charges or fees taxed by the court such as filing fees, jury fees, courthouse fees, and reporter fees. People versus despensa, we cite on page 32 of our brief. Evidence deposition fees are taxable if used at trial, but are these all discovery depositions? I believe they were all discovery depositions, Your Honor. I do think they were. The final point I would make, which I plan to actually just spend some time talking about, was this issue of consent, if you will, or knowledge on the part of the university with regard to this, and how that impacts the analysis under the Illinois Whistleblower Act. And the trial court relied upon an important case, which I think is pertinent to the discussion here, and something that perhaps this court would like to review as well, and that's the U.S. Ex Rel. Durgles v. FKW case. And the reason that's important, and the reason why we think it has application here, is because in that case, as here, there was no dispute that the governmental entity at issue directed the person to submit forms and documentation and make a claim, if you will, in the manner that was done. And the Court of Appeals, the Seventh Circuit, held in that case that Durgles is alleging that the government was defrauded by the very activities that its agents ordered. And under those circumstances, the court affirmed summary judgment in favor of the person who had submitted those claims and refused to hold that person liable following the government's explicit directions. And that's, we think, pretty much exactly what we have here, that Dr. Jones was required, commanded, directed by the administration at the university to maintain an office, a headquarters, to conduct the majority of his office business in Belleville, Illinois. He did that, and then since 1978, he submitted appropriate documentation forms that remain unchallenged here, and he was reimbursed for those travel expenses appropriately and repeatedly. There's simply no evidence before this court that Dr. Jones knowingly, as Your Honor, you asked about that scienter requirement, that Dr. Jones knowingly defrauded anything. If there are no further questions, I'm finished. Thank you. Rebuttal. I cited page 18 of my brief, two cases that indicate that unless the depositions are used in trial, they're not going to cost any money, they're not going to be awardable. They did respond, and that's the bulk of what their cost- Could you speak up a little? I'm sorry. That's the bulk of what their cost, the bill of cost is. I would like the court, if it could, to take a look at C-371 through 389 of the record. That's a TA-12 form, and you use that TA-12 form when there is a question about where the faculty member, state employee, spends the majority of their time. Well, it is true that even though we think he made way too many trips to Carbondale, he didn't spend the majority of his time in Carbondale. But he also testified he didn't spend virtually any time in his office at his home. So that's why you file a TA-12 form, and the regulations are attached, so that somebody in Springfield knows what's going on and can monitor this. And they didn't do that. Mr. Jones didn't spend any time in this office doing anything. And what's interesting about- Didn't he have a filing cabinet in his office? He had a couple. Was there any testimony or any evidence of what was in that filing cabinet? He said he kept the records of where he was going from Belleville. He said his deposition testimony was he kept some student files in there. So the student that he was going to see, that file was probably in Belleville in his filing cabinet at one time. I don't know. He said he kept some- I don't know whether it was a duplicate file or not, but what's disturbing is that that filing cabinet wasn't locked. It wasn't what? It was not locked. Locked? Locked. It wasn't secure. The door into his home was not secured. This 1983 letter was to support Mr. Jones for some home office exemption. And if you look at his testimony, if he's trying to claim that office as a home office exemption on the IRS regs, he's got big problems because it doesn't qualify under any shape under the IRS norm. Was the office secure in Armandale? Was it locked? Did it have locks on everything? Or was it a cubbyhole in a room? I think the only thing that I can say, if you look at Weisenbecker's testimony, it's an office that doesn't appear, I think, on the outset. I think that's a fair inference. It's any different than any other office in the Long Building. And I don't know what the other offices are like in the Long Building. Does anybody? I've been in the Long Building. I'm getting way outside the record here, but I don't see any cubbyholes there. They're just some long-string offices. And he's got to have at one of them is what we've got here. Well, what would you have someone do who travels for the university for their job? What would you have them do? If I were advising Mr. Jones, I would have told him, number one, you need to change these forms and indicate that your office is in your home in Belleville. You need to change the publication, the website. You need to change the faculty phone book. You need to change all of those things. And you also need to get approval from the Legislative Audit Commission up in Springfield and file the TA-12 form. And they didn't, and I think one of the reasons they may not have, I think it's something we should be able to explore at trial, is that he doesn't want to be cross-examined on that. Now, back to the deposition issue very quickly. I guess what I need to do, and I really would like some clarification, I guess what I need to do in the future is when we have our first meeting with the judge, say, okay, what's your rule on depositions? Because I think it's just been abused way too often in litigation in state court. And I would like you to issue an order that Mr. Cooper, Mr. Dunn, anybody else, is not to consult with the witnesses like it is at trial. But we need some clarity on this issue because if you go back and you look at the deposition, you know, it's just too obvious. He talks with Mr. Cooper in his daily, comes back and says, I've got a clarification that I want here. Well, unless the court feels like that's appropriate behavior, even in a discovery deposition, then there needs to be some kind of remedy prohibiting that kind of conduct. Do you not think you could have moved to strike that? Would I move, Your Honor, would I move that he be required to come back for a second deposition and answer the question? Thank you, counsel. Thank you, David, on your advisement. You've advised the order in court. Next case on the call is.